# EXHIBIT A

1  MARY E. ALEXANDER, ESQ. (SBN: 104173)
2  BRENDAN D.S. WAY, ESQ. (SBN: 261705)
   CATALINA S. MUÑOZ, ESQ. (SBN: 317856)
3  MARY ALEXANDER & ASSOCIATES, P.C.
   44 Montgomery Street, Suite 1303
4  San Francisco, CA 94104
   Telephone: (415) 433-4440
5  Facsimile: (415) 433-5440

6  Attorneys for Plaintiffs

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

**JUL 2 4 2020**

CLERK OF THE SUPERIOR COURT
By _____
                                    Deputy

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF ALAMEDA

10

11  DEVRA HUTCHINSON, Individually, as Personal      ) Case No.
    Representative of the ESTATE OF NAOMI LYDIA      )
12  and as Successor in Interest of NAOMI LYDIA;     ) **RG20068771**
    GARY LYDIA, Individually and as Successor in     ) **PLAINTIFFS' COMPLAINT FOR**
13  Interest of NAOMI LYDIA,                         ) **DAMAGES; DEMAND FOR JURY**
                                                     ) **TRIAL**
14                    Plaintiffs,                    )
                                                     )  1. Strict Liability - Failure to Warn
15        v.                                         )  2. Strict Liability - Design Defect-
                                                     )     Risk-Benefit
16                                                   )  3. Strict Liability - Design Defect -
    JOHNSON & JOHNSON, a New Jersey                  )     Consumer Expectations
17  corporation doing business in California;        )  4. Negligent Failure to Warn
    JOHNSON & JOHNSON CONSUMER INC.                  )  5. Deceit by Concealment
18  F/K/A JOHNSON & JOHNSON CONSUMER                 )  6. Survival Action
    COMPANIES, INC., a New Jersey corporation        )  7. Wrongful Death
19  doing business in California; and                )
    DOES 1 through 100, inclusive,                   )
20                                                   )
                                                     )
21                    Defendants.                    )
                                                     )
22                                                   )
                                                     )
23                                                   )
                                                     )
24                                                   )
                                                     )
25  _____ )

26

27

28

_____

           PLAINTIFFS' COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Filed By Fax

COMES NOW Plaintiffs, DEVRA HUTCHINSON, Individually, as Personal Representative of the ESTATE OF NAOMI LYDIA and as Successor in Interest of NAOMI LYDIA; GARY LYDIA, Individually and as Successor in Interest of NAOMI LYDIA, by and through their attorneys, Mary Alexander & Associates, P.C., and submit this Complaint for Damages against each of the Defendants named herein.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff DEVRA HUTCHINSON, the surviving adult daughter of Decedent NAOMI LYDIA, is a resident of Alameda County, State of California.

2.      Plaintiff GARY LYDIA, the surviving adult son of Decedent NAOMI LYDIA, is a resident of Alameda County, State of California.

3.      Plaintiff DEVRA HUTCHINSON brings this action, *inter alia*, as specified in Code of Civil Procedure § 377.30 *et seq.* and § 377.60, individually, and on behalf of the ESTATE OF NAOMI LYDIA ("Decedent") and Decedent's surviving heirs.  Plaintiff DEVRA HUTCHINSON has executed and is filing a declaration under penalty of perjury pursuant to Code of Civil Procedure§ 377.32.

4.      Plaintiffs are informed and believe, and based thereon allege, that at all relevant times Defendant JOHNSON & JOHNSON is a corporation doing business in and authorized to do business in the state of California and was incorporated in New Jersey in 1887.

5.      Plaintiffs are informed and believe, and based thereon allege, that at all relevant times Defendant JOHNSON & JOHNSON maintains an office located at One Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933 as well as several locations within the state of California, and has approximately 127,100 employees worldwide.  As stated in JOHNSON & JOHNSON'S Form 10-K Annual Report Pursuant to Section 13 of the Securities Exchange Act of 1934 for the fiscal year ended January 3, 2016, JOHNSON & JOHNSON'S primary focus is on products related to human health and well-being.

6.      Plaintiffs are informed and believe, and based thereon allege that at all relevant times Defendant JOHNSON & JOHNSON'S family of companies includes more than 250 operating companies conducting business in 60 countries of the world and organized into three business segments: Consumer, Pharmaceutical and Medical Devices.

7.      Plaintiffs are informed and believe, and based thereon allege that at all relevant times the JOHNSON & JOHNSON family of companies includes 121 manufacturing facilities and, within the United States, eight facilities are used by the Consumer segment.  In addition to the manufacturing facilities, JOHNSON & JOHNSON maintains numerous offices and warehouses in the United States.

8.      Plaintiffs are informed and believe, and based thereon allege that at all relevant times the Consumer segment of the JOHNSON & JOHNSON family of companies includes a broad range of over-the-counter products including, but not limited to, Shower to Shower body powder and Johnson & Johnson's Baby Powder.  These products are marketed to the general public and sold both to retail outlets and distributors throughout the world.

9.      Plaintiffs are informed and believe, and based thereon allege that at all relevant times, Defendant JOHNSON & JOHNSON has engaged in substantial, continuous economic activity in California, including marketing, distribution, and sale of billions of dollars in products to Californians including, but not limited to, Shower to Shower body powder and Johnson & Johnson's Baby Powder, that said activity by Defendant is substantially connected to the Plaintiffs' claims as alleged herein.

10.      Plaintiffs are informed and believe, and based thereon allege at all relevant times, Defendant JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., was a New Jersey Corporation doing business in the state of California, a wholly owned subsidiary of JOHNSON & JOHNSON, and engaged in substantial, continuous economic activity in California, including marketing, distribution, and sale of billions dollars in products to Californians including, but not limited to, Shower to Shower body powder and Johnson & Johnson Baby Powder, that said activity by Defendant is substantially connected to the Plaintiffs' claims as alleged herein. JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. are hereinafter referred to collectively as the "JOHNSON & JOHNSON" Defendants.

11.      Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of Defendants Does 1 through 100, inclusive, were unknown to Plaintiffs at the time of filing of this complaint in this action and, therefore sue said Defendants by such fictitious names.

12.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 100, inclusive, remain unknown to Plaintiffs and, therefore Plaintiffs sue said Defendants by such fictitious names.  Plaintiffs are informed and believe and based thereon allege that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

13.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, all of said Defendants herein, including DOES 1 through 100, inclusive, are collectively referred to herein as "Defendants" and all acts and omissions of Defendants as alleged herein were undertaken by each of the Defendants or said Defendants' agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownerships.

14.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, all allegations concerning Defendants include Defendants' parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, organizational units of any kind, predecessors, successors and assigns, and their officers, directors, employees, agents, representatives, and any and all other persons acting on behalf of Defendants.

15.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, Defendants and DOES 1 through 100, inclusive, designed, developed, patented, manufactured, marketed, advertised, promoted and/or sold the PRODUCTS worldwide and in the State of California.

16.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, Defendants and DOES 1 through 100 were engaged in the business of placing Shower to Shower body powder and Johnson & Johnson's Baby Powder (hereinafter "PRODUCTS") into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and/or selling said PRODUCTS to Californians, including Decedent herein as follows: JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and sold the PRODUCTS to consumers for sale to the general public worldwide and in the state of California.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

17.     At all pertinent times, including from 1923 to 1998, Decedent NAOMI LYDIA purchased the PRODUCTS and used said PRODUCTS on a daily basis in and around her perineal region.  While a citizen and resident of the State of California, County of Alameda, Decedent purchased the PRODUCTS and used the PRODUCTS by applying the PRODUCTS to her body in accordance with the instructions for use that accompanied the PRODUCTS and in a reasonably foreseeable manner.

18.     In or about February, 1995, Decedent NAOMI LYDIA was diagnosed with ovarian cancer, and underwent treatments for said ovarian cancer.  Decedent was diagnosed with ovarian cancer, and suffered effects and symptoms, as a direct and proximate result of the unreasonably dangerous and defective nature of talcum powder, the main ingredient of the PRODUCTS, and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, advertising, promotion, distribution, marketing, and sale of the PRODUCTS.

19.     Decedent NAOMI LYDIA died on May 1, 1998, as a result of ovarian cancer.  The premature death of Decedent due to ovarian cancer was the direct and proximate result of the unreasonably dangerous and defective nature of the PRODUCTS and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, advertising, promotion, distribution, marketing, and sale of the PRODUCTS.

20.     As a direct and proximate result of the injuries alleged herein, Decedent NAOMI LYDIA was injured catastrophically and suffered economic damages before dying as a result of the ovarian cancer. Plaintiffs DEVRA HUTCHINSON and GARY LYDIA seek all available economic and noneconomic damages in survival and wrongful death actions, including but not limited to medical, funeral and burial expenses, loss of household services, monetary contributions and financial support from Decedent, including loss of earnings, loss of Decedent's value to her estate, loss of gifts or benefits, as well as noneconomic damages, including but not limited to deprivation of the love, affection, solace, companionship, society, moral support, assistance, protection, training and guidance, services, comfort, care, counsel, and advice of Decedent.

21.     Plaintiffs are informed and believe, and based thereon allege that, all claims in this action are a direct and proximate result of Defendants' and/or their corporate predecessors negligent, willful, and wrongful conduct as follows: JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER

1   INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC.'S design, development,

2   manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the

3   PRODUCTS.

4       22.    Plaintiffs in this action seek recovery for damages as a result of Decedent developing

5   ovarian cancer, which was directly and proximately caused by such wrongful conduct by Defendants,

6   the unreasonably dangerous and defective nature of the talcum powder, the main ingredient of the

7   PRODUCTS, and the attendant effects of developing and suffering from ovarian cancer

8       23.    Decedent NAOMI LYDIA developed ovarian cancer, and suffered effects attendant thereto,

9   as a direct and proximate result of the unreasonably dangerous and defective nature of the PRODUCTS and

10   the talcum powder therein, and Defendants' wrongful and negligent conduct as follows: JOHNSON &

11   JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON

12   CONSUMER COMPANIES, INC.'s design, development, manufacture, testing, packaging, promoting,

13   marketing, distribution, labeling, and/or sale of the PRODUCTS.  As a direct and proximate result of these

14   injuries, Plaintiffs and Decedent have incurred economic and noneconomic damages as alleged herein.

15       24.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

16   alleged herein, all Defendants were engaged in the research, development, manufacture, design, testing,

17   sale and marketing of PRODUCTS as follows:  JOHNSON & JOHNSON and JOHNSON & JOHNSON

18   CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. designed,

19   developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or

20   sold the PRODUCTS and Defendants introduced said PRODUCTS into interstate commerce with

21   knowledge and intent that such PRODUCTS be sold to consumers in the State of California.

22       25.    Venue is proper in this Court because Plaintiffs are citizens of the State of California, and

23   Decedent purchased the PRODUCTS in the State of California from 1923 to 1998, used the PRODUCTS

24   in the State of California from 1923 to 1998, was exposed to the PRODUCTS in the State of California

25   from 1923 to 1998, including purchase, use and exposure in the County of Alameda, and was diagnosed

26   and treated for the subject injuries in the State of California.

27   ///

28   ///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

**COMMON FACTUAL ALLEGATIONS**

     **a.**    ***Introduction to the PRODUCTS***

    26.    Historically, the PRODUCTS, "Johnson's Baby Powder" and "Shower to Shower" have represented freshness, cleanliness, and purity.

    27.    Upon information and belief, at all relevant times alleged herein, the Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. advertised and marketed "Johnson's Baby Powder" as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild".  The Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. compelled women through advertisements to dust themselves with this product to mask odors.  The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

    28.    Upon information and belief, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. advertised and marketed the product "Shower to Shower" as safe for use by women, as evidenced in its slogan "A sprinkle a day keeps odor away," and through advertisements such as "Your body perspires in more places than just under your arms.  Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day."  And "SHOWER to SHOWER can be used all over your body."

    29.    Decedent herein used the PRODUCTS to dust her perineum for feminine hygiene purposes.  This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

    30.    Upon information and belief, the PRODUCTS are composed almost entirely of magnesium trisilicate, also known as talc.  Talc is an inorganic mineral that is mined from the earth.

    31.    Upon information and belief, since as early as the 1970s, JOHNSON & JOHNSON has been on notice of an association between talc exposure and ovarian cancer, as discussed more fully below.

32.      Upon information and belief, since the 1970s, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. have nonetheless continually advertised and marketed the PRODUCTS as safe for human use.  Upon information and belief, JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. decided to downgrade the quality of the talc product supplied by IMERYS and informed IMERYS to supply a downgraded version of the talc product to use in its PRODUCT in order to reduce costs and increase profits for JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC.

33.      At all relevant times alleged herein, a feasible alternative to the PRODUCTS has existed.  Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects.  Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness.

   **b.**      *Timeline of the Scientific Literature Analyzing the Relationship Between Talc and Ovarian Cancer*

34.      Research published as early as 1961 has established that particles, like talc, can translocate from the exterior genital area to the ovaries in women.  See G.E. Egli, and Michael Newton, The Transport of Carbon Particles in the Human Female Reproductive Tract, 12 FERTILITY STERILITY 2, 151-155 (1961).

35.      Due to talc's potential for transmission, researchers remained concerned about its carcinogenic nature and the effects of use.  In 1968, a study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%.  The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . .  Unknown significant amounts of such materials in products that may be used without precautions may create unsuspected problem."  L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 29 Am. Industrial Hygiene Assoc. J. 350-354 (1968).  A 1976 follow-up study concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for

7

cosmetic talc . . .  We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products."  Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J TOXICOL ENVIRON HEALTH  255-284 (1976).

36.     In 1971, the first study was published that suggested an association between talc and ovarian cancer.  This study was published by W. J. Henderson in Cardiff, Wales at the Tenovus Institute.  The study found talc particles "deeply embedded" in ten of thirteen ovarian tumors, twelve of twenty-one cervical tumors, one primary carcinoma of the endometrium and five of twelve "normal" ovaries from women with breast cancer.  W. J. Henderson et al., *Talc and carcinoma of the ovary and cervix*, 78 J. OBSTET. GYNAECOL. BR. COMMW. 3, 266-272 (1971).

37.     In 1982, the first epidemiologic study was published on talc powder use in the female genital area.  This study was published by Dr. Daniel Cramer and others.  This study found a 92% increased risk in ovarian cancer with women who reported genital talc use.  Additionally, it found that talc application directly to the genital area around the time of ovulation might lead to talc particles becoming deeply imbedded in the tissues of the ovary, and perhaps causing foreign body reaction capable of causing growth of epithelial ovarian tissue.   This study showed an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer.  Daniel Cramer et al., *Ovarian cancer and talc: a case control study*, 50 CANCER 372-376 ( 1982).

38.     Since 1982, there have been approximately twenty-two (22) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer.  Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women:

- In 1983, Patricia Hartage and Robert Hoover of the National Cancer Institute and Linda Lester and Larry McGowan of the George Washington University Medical Center, published a case-control interview study regarding ovarian cancer.  Although no association was proven due to the small sample size, the study found an "excess relative risk" of 2.5 (95% CI=0.7 to 10.0) of ovarian cancer for women who use talc in the genital area.  Patricia Hartage et al., *Talc and ovarian cancer*, 250 JAMA 1844 (1983) *available at* http://jamanetwork.com/journals/jama/article-abstract/1725023.

- In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

controls found that 52% of the cancer patients habitually used talc on the perineum before their cancer diagnosis.  The study showed that women using talc daily on their perineum had 1.45 times the risk of ovarian cancer then women that did not use talc daily, showing a positive dose-response relationship.  Alice Whittemore et al., *Personal and environmental characteristics related to epithelial ovarian cancer.  II. Exposures talcum powder, tobacco, alcohol, and coffee*, 1 2 8   Am. J. Epidemiol. 6,  1228-1240 (1988).

- A case control study conducted in 1989 found similar results.  The study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found an increased risk in ovarian cancer with women who reported genital talc powder use more than once per week.  Margaret Booth et al., *Risk factors for ovarian cancer: a case-control study*, 60 Br. J. Cancer 4, 592-598 (1989).

- Another case control study conducted in 1989 by Bernard Harlow of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing, and a statistically significant increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum.  This study also found a positive dose-response relationship.  Bernard Harlow and Neinke Weiss, *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*, 130 Am. J. Epidemiol. 2, 390-394 (1989).

- A 1992 study, also by Dr. Harlow, found that frequent and long term talc use directly on the genital area during ovulation increased a woman's risk of ovarian cancer threefold. The study also found "[t]he most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals).  Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer."  This study looked at 235 ovarian cancer cases compared to 239 controls, concluding that "given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits.  For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit."  Bernard Harlow et al., *Perineal exposure to talc and ovarian cancer risk*, 80 Obstet. Gynecol. 1, 19-26

9

(1992).

- Also in 1992, a case-control study was conducted by Karin Rosenblatt at the Department of Epidemiology of John's Hopkins School of Hygiene and Public Health.  This study showed that the development of ovarian cancer may be associated with genital fiber exposure (especially talc on sanitary napkins), and a relative risk of 4.8 for ovarian cancer development from talc use on sanitary napkins.  Karen Rosenblatt et al., *Mineral fiber exposure and the development of ovarian cancer*, 4 5  GYNECOL. ONCOL. 20-25  ( 1992).

- Another 1992 case-control study conducted by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months.  Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, 21 INT. J. EPIDEMIOL.  23-29 (1992).

- In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  The study found "some evidence of carcinogenic activity in male rats" and "clear evidence of carcinogenic activity in female rats."  Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.  National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)*, Technical Report Series No. 421 (September  1993).

- In 1995, a case control study conducted in Australia by David Purdie, involving over 1600 women found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the region of the abdomen or perineum.  David Purdie et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study*, 62 INT. J. CANCER 6, 678-684 (1995).

- In 1996, a case-control study similarly found a statistically significant increased risk of ovarian cancer in women who used talc-based powders in their genital area.  *See* Asher Shushan et al., *Human menopausal gonadotropin and the risk of epithelial ovarian cancer*, 65 FERTIL. STERIL. 1, 13-18 (1995).

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

- In 1996, the condom industry stopped coating condoms with talc due to the health concerns of ovarian cancer, "[c]oncern about talc as an ovarian carcinogen goes back 50 years in the medical literature.  By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries.  Scientists believed in some cases that the scarring led to infertility or cancer."  Marie McCullough, *Women's health concerns prompt condom makers to stop using talc*, Jersey City Journal (City Ed.) (Jan. 10, 1996).

- In 1997, a case-control study of 313 women with ovarian cancer and 422 controls found that the women with cancer were more likely to have applied talc powder to their external genitalia area.  Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer.  Linda Cook et al., *Perineal powder exposure and the risk of ovarian cance*r, 145 AM. J. EPIDEMIOL.  459-465 (1997).

- In 1997, a case-control study conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine, which included over 1,000 women found a statistically significant increased risk for ovarian cancer for women who applied talc via sanitary napkins to their perineum.  The study indicated that "[c]ommercial talc substitutes often replace talc with cornstarch.  Furthermore, women may choose to powder or dust with cornstarch instead of talc.  When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found," concluding "[t]he results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma.  Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated."  Stella Chang and Harvey Risch, *Perineal talc exposure and risk of ovarian carcinoma*, 79 CANCER 12, 2396-2401 (1997).

- A 1998 case-control study conducted in Canada by Beatrice Godard found increased risk of ovarian cancer in women who used talc-based powders on their perineum.  Beatrice Godard et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study*, 179 AM. J. OBSTET. GYNECOL. 2, 403-410 (1998).

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

- In 1999, Dr. Cramer conducted a case-control study of 563 women newly diagnosed with epithelial ovarian cancer and 523 controls. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum: "[w]e conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute ("NCI"). Daniel Cramer et al., *Genital talc exposure and risk of ovarian cancer*, 81 INT. J. CANCER 3, 351-356 (1999).

- In 2000, Roberta Ness, from University of Pennsylvania, led a case control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation, and that inflammation contributes to cancer cell development. Roberta Ness et al., *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11 EPIDEMIOLOGY 2, 111-117 (2000).

- Also in 2000, a prospective cohort study found a 40% increase in invasive serous cancers from women who applied talc to their perineum. Dorota Getrig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. Natl. Cancer Inst. 3, 249-252 (2000).

- In 2003, a meta-analysis was conducted which re-analyzed data from 16 studies published prior to 2003, finding a 33% increase in ovarian cancer risk among talc users. Michael Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies*, 23 ANTICANCER RES. 2C, 1955-60 (2003).

- In 2004, a case-control study of nearly 1400 women from twenty-two counties was performed in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use, compared with women using cornstarch powders as "[c]ornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc." This study concluded that "users should

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

exercise prudence in reducing or eliminating use", and "the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy.  Unlike other forms of environmental exposures, talcum powder use is easily avoidable."  Paul Mills et al., *Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California*, 112 INT. J. CANCER 458-64 (2004).

- In 2008, Margaret Gates performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study (the "Gates Study").  This study was funded by NCI, and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use.  A 60% increased risk of the serous invasive subtype was also found.  Dr. Gates noted a pronounced and positive dose-response relationship, increasing risk with increasing talc usage by women.  These results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer . . . the finding of highly significant trends between increasing frequency of use and risk 'strengthen[ing] the evidence of an association, because most previous studies have not observed a dose response.'"  Notably, the study promoted an alternative to talc, cornstarch, which "has not been shown to increase ovarian cancer risk . . . "  The study concluded that "women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk.  Physicians should ask the patient about talc use history and should advise the patient to discontinue using talc in the genital area if the patient has not already stopped."  Margaret Gates et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 CANCER EPIDEMIOL. BIO. & PREV. 9, 2436-2444 (2008).

- In October of 2008, Michael Thun, Vice-President of Epidemiology and Surveillance Research at the American Cancer Society commented on the Gates Study.  He stated the dose-response relationship between talc and ovarian cancer had finally been confirmed by this study: "[t]here are very few modifiable risk factors for ovarian cancer.  The main one is the

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer.  Others include tubal ligation, hysterectomy, and parity.  Then there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in, alongside asbestos, postmenopausal hormone therapy, and radiation."  Zosia Chustecka and Desiree Lie, *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer*, Medscape Medical News (Oct. 8, 2008) *available at* http://www.medscape.com/viewarticle/581781.

- In 2008, Melissa Merritt, from the Australian Cancer Study and Australian Ovarian Cancer Study Group, conducted a case-control study of over 3,000 women finding a statistically significant increased risk of ovarian cancer for women who used talc on their perineum was confirmed.  This study also confirmed a statistically significant increased risk of ovarian cancer of a serous subtype in women who used talc on their perineum.  Melissa Merritt et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*, 122 INT. J. CANCER 1, 170-176 (2008).

- In 2009, a case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with frequency and duration of talc use.  The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use.  The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use.  In conclusion, the study stated, "that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies."  Anna Wu et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*, 124 INT. J. CANCER 6, 1409-1415 (2009).

- Various meta-analyses conducted have found positive associations between the use of talc in the genital area and ovarian cancer.  *See generally* Bernard Harlow et al., *Perineal exposure to talc and ovarian cancer risk*, 80 OBSTET. GYNECOL. 1, 19-26 (1992); Andrew Gross, *A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer*, 5 J. EXPO. ANAL. ENVIRON. EPIDEMIOL. 2, 181-195 (1995); Michael Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies*, 23 ANTICANCER RES. 1955-60

14

1    (2003).

2    **c.**      ***Knowledge of the Connection Between Talc Usage and Ovarian Cancer within the***

3             ***Government, within the Medical Community, and within the Defendant Companies***

4         39.    Upon information and belief, in 1975, JOHNSON & JOHNSON was aware of Henderson,

5    *et al.'s* Tenovus data suggesting an association between talc and ovarian cancer, and was thereby on

6    notice of the association as early as the mid-1970s, and JOHNSON & JOHNSON sent a donation to the

7    Cardiff Scientific Society in or to obtain information concerning research being conducted Tenovus

8    Institute and JOHNSON & JOHNSON admitted that it was on notice of the talc and ovarian cancer

9    problem.

10        40.    Upon information and belief, shortly after Dr. Cramer's 1982 study was published, Dr.

11   Semple visited with Dr. Cramer about his study.  Dr. Cramer advised Dr. Semple that JOHNSON &

12   JOHNSON should place a warning on its talcum powder PRODUCTS concerning ovarian cancer risks so

13   that women could make an informed decision about their health.

14        41.    Upon information and belief, on August 12, 1982, JOHNSON & JOHNSON publicly

15   recognized the studies linking the use of the PRODUCTS to ovarian cancer.  In a New York Times

16   article entitled "Talcum Company Calls Study on Cancer Link Inconclusive", the company admitted

17   to  being aware of the 1982 Cramer article that concluded women who apply talc daily to their genital

18   areas were three times more likely to contract ovarian cancer.

19        42.    Upon information and belief, JOHNSON & JOHNSON recognized that the safety of

20   cosmetic powders was a concern, included that item in its for internal meetings and strategies in May of

21   1986 admitting that baby powder sales were declining. "the safety of cosmetic powders has been a

22   concern, especially among health professionals, that studies have implicated talc use in the vaginal area

23   with incidents of ovarian cancer and that Johnson's Baby Powder sales were declining along with the

24   overall cosmetic powders market in a classic mature model curve.  Upon information and belief,

25   JOHNSON & JOHNSON in approximately 1992 was looking for "opportunities to grow" the Baby

26   Powder franchise despite the fact that the same internal document cited cancer linkage as a major

27   obstacle" and recommended implementing a plan to market to Hispanic and African American's by

28   launching an adult Hispanic media program and potentially launching an adult black print effort.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

43.     In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

44.     Upon information and belief, on November 10, 1994, the Cancer Prevention Coalition mailed a letter to then JOHNSON & JOHNSON C.B.O, Ralph Larson, informing the company that studies as far back as 1960's " ... show conclusively that the frequent use of talcum powder in the genital area pose a serious health risk of ovarian cancer."  Upon information and belief, the letter cited a recent study from Dr. Harlow of Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area.  Upon information and belief, the letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate.  Upon information and belief, the letter concluded by requesting that JOHNSON & JOHNSON withdraw talc products from the market, or at a minimum, place warning information on its talc-based products disclosing the risk of ovarian cancer.

45.     Upon information and belief, in 1996, the condom industry stopped coating condoms containing the talc ingredient due to the health concerns of ovarian cancer.  Upon information and belief, on September 17, 1997, JOHNSON & JOHNSON was notified that on three separate occasions TIPTF had released false information to the public about the safety of talc, that studies had shown a statistically significant association between hygienic talc use and ovarian cancer, and that anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary..

46.     In February of 2006, IARC published a paper whereby they classified perineal use of talc based body powder as a "Group 2B" human carcinogen.  IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc.  IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder."  By definition "Limited

1   evidence of carcinogenicity" means "a positive association has been observed between exposure to the

2   agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but

3   chance, bias or confounding could not be ruled out with reasonable confidence."

4        47.     In 2006, the Canadian government under The Hazardous Products Act and associated

5   Controlled Products Regulations classified talc as a "D2A", "very toxic", "cancer causing" substance

6   under its Workplace Hazardous Materials Information System (WHMIS).  Asbestos is also classified as

7   "D2A".

8        48.     Upon information and belief, in 2006, JOHNSON & JOHNSON'S talc product supplier

9   Imerys began placing a warning on the Material Safety Data Sheets (MSDS) it provided to JOHNSON &

10  JOHNSON in conjunction with the talc product it sold to them to be used in the PRODUCTS.  These

11  MSDSs provided the warning information about the IARC classification, warning information regarding

12  "States Rights to Know," and warning information about the Canadian Government's "D2A" talc

13  classification.

14       49.     Upon information and belief, in spite of the mounting evidence pointing to the

15  carcinogenicity of the PRODUCTS, particularly when used in the perineal region, from 2008 through

16  2009 JOHNSON & JOHNSON admitted that its marketing was targeting use of JOHNSON &

17  JOHNSON'S baby powder for obese women.

18       **d.**     ***JOHNSON & JOHNSON Failed to Warn Consumers of the Dangers of Talc Use***

19       50.     At all times herein mentioned, JOHNSON & JOHNSON had a duty to know and warn

20  about the hazards associated with the use of the PRODUCTS.

21       51.     Upon information and belief, at all times herein mentioned, despite the mounting scientific

22  and medical evidence regarding talc use and ovarian cancer development over the past several decades,

23  none of the JOHNSON & JOHNSON warnings on product labels or in other marketing informed

24  Plaintiffs' Decedent, or similarly situated individuals, that use of the PRODUCTS in the genital area

25  could lead to an increased risk of ovarian cancer.  For example, the only warnings on the Baby Powder

26  label are to "[k]eep powder away from child's face to avoid inhalation, which can cause breathing

27  problems," and to "[a]void contact with eyes."  The label also states: "SAFETY TIP: Keep out of reach of

28  children.  Do not use if quality seal is broken."  JOHNSON & JOHNSON provides similar warnings on

their website: "[f]or external use only.  Keep out of reach of children.  Close tightly after use.  Do not use on broken skin.  Avoid contact with eyes.  Keep powder away from child's face to avoid inhalation, which can cause breathing problems."

52.     Upon information and belief, at all times herein mentioned, JOHNSON & JOHNSON continues to represent on the labeling and in their marketing that Johnson's Baby Powder has "clinically proven mildness", is "clinically proven to be safe, gentle and mild", and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer reviewed studies."

53.     Upon information and belief, at all times herein mentioned, JOHNSON & JOHNSON failed to inform its customers and end users of the PRODUCTS of a known catastrophic health hazard associated with their use.

54.     Upon information and belief, at all times herein mentioned, JOHNSON & JOHNSON procured and disseminated false, misleading, and biased information regarding the safety of its PRODUCTS to the public and used influence over governmental and regulatory bodies regarding talc.

55.     Upon information and belief, as a direct and proximate result of the JOHNSON & JOHNSON Defendants' calculated and reprehensible conduct, Decedent suffered catastrophic injuries and damages, namely ovarian cancer, which required surgeries and treatments.

**e.**     *JOHNSON & JOHNSON and IMERYS Conspired to Conceal the Dangers of Talc*

56.     Upon information and belief, the JOHNSON & JOHNSON Defendants and IMERYS and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves to cause  injuries,  diseases, and/or illnesses  by exposing Decedent to the harmful and dangerous PRODUCTS. JOHNSON & JOHNSON and IMERYS knowingly agreed, contrived, confederated and conspired to deprive Decedent of the opportunity of informed free choice as to whether to use the PRODUCTS or to expose herself to the dangers associated with them.  JOHNSON & JOHNSON and IMERYS committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of the talcum powder contained within the PRODUCTS.

57.     Upon information and belief, in furtherance of said conspiracies, for decades JOHNSON & JOHNSON and IMERYS individually, jointly, and in conspiracy with each other, have been in

possession of medical and scientific data, literature and test reports which clearly indicated that ordinary and foreseeable use of their PRODUCTS by women is unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly.

58.     Upon information and belief, in furtherance of said conspiracies, JOHNSON & JOHNSON and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and available to said Defendants, individually, jointly, and in conspiracy with each other, fraudulently, willfully and maliciously withheld, concealed and suppressed medical information regarding the increased risk of ovarian cancer (as set out hereinabove). Upon information and belief, in furtherance of said conspiracies, JOHNSON & JOHNSON and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and available to said Defendants, individually, jointly, and in conspiracy with each other, caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer which JOHNSON & JOHNSON and IMERYS knew were incorrect, incomplete, outdated, and misleading. Upon information and belief, specifically, through TIPTF, JOHNSON & JOHNSON and IMERYS collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. Upon information and belief, in a letter dated September 17, 1997, JOHNSON & JOHNSON and IMERYS were criticized by their own Toxicologist consultant for releasing this false information to the public, as stated hereinabove, yet nothing was done by JOHNSON & JOHNSON and IMERYS to correct or redact this public release of knowingly false information.

59.     Upon information and belief, in furtherance of said conspiracies, JOHNSON & JOHNSON and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and available to said Defendants, individually, jointly, and in conspiracy with each other, by these false and fraudulent representations, omissions, and concealments, intended to induce Decedent and others to rely upon false and fraudulent representations, omissions and concealments, and to continue to expose themselves to the dangers inherent in the use and exposure to the PRODUCTS.

60.     Upon information and belief, individually and in concert with each other, JOHNSON & JOHNSON and IMERYS participated in a common plan to commit the torts alleged herein, and each

acted tortuously in pursuance of the common plan to protect and promote the health and safety of talc use, to the known detriment of the public, including Decedent.

61.     Decedent reasonably and in good faith relied upon false representations, omissions, and concealments made by JOHNSON & JOHNSON and IMERYS regarding the nature of the PRODUCTS.

**FIRST CAUSE OF ACTION**

**STRICT LIABILITY - FAILURE TO WARN**

62.     Plaintiffs hereby incorporate each of the preceding paragraphs as if fully set forth herein.

63.     On information and belief, JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., manufactured, distributed, and sold the talc PRODUCTS used by Decedent.

64.     On information and belief, the PRODUCTS had potential risk and side effects that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of their manufacture, distribution and sale.

65.     On information and belief, the potential risks and side effects presented a substantial danger when the PRODUCTS were used or misused in an intended or reasonably foreseeable way.

66.     On information and belief, ordinary consumers would not have recognized the potential risks and side effects described herein.

67.     On information and belief, Defendants failed to adequately warn or instruct of the potential risks and side effects as evidenced through the following conduct:

- Omitting from warnings on product labels or from other marketing materials the warning that use of the PRODUCTS in the genital area could lead to an increased risk of ovarian cancer.

- Representing on the labeling and in their marketing materials that Johnson's Baby Powder has "clinically proven mildness," is "clinically proven to be safe, gentle and mild," and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer reviewed studies."

- Failing to inform its customers and end users of the PRODUCTS, including Decedent,

of a known catastrophic health hazard associated with their use.

- Procuring and disseminating false, misleading, and biased information regarding the safety of its PRODUCTS to the public and using influence over governmental and regulatory bodies regarding talc.

68.     As a result of JOHNSON AND JOHNSON'S and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC.'S, failure to warn, Decedent used the PRODUCTS and was harmed by her use of said PRODUCTS as described herein.

69.     As a further direct and proximate result of Defendants' failure to provide adequate warnings and failure to use reasonable care to warn of the dangerous risks and effects of the PRODUCTS, Plaintiffs and Decedent have suffered economic and noneconomic damages as alleged herein.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY - DESIGN DEFECT - RISK - BENEFIT

70.     Plaintiffs hereby incorporate each of the preceding paragraphs as if fully set forth herein.

71.     On information and belief, at all relevant times alleged herein, the PRODUCTS were designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to be tested, inspected or failed to be inspected, labeled, advertised, promoted, marketed, supplied, distributed, licensed, wholesaled, and sold by Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. in the regular course of business.

72.     On information and belief, at all relevant times alleged herein, the PRODUCTS manufactured, supplied, licensed and/or placed into the stream of commerce by Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. were defective and unreasonably dangerous in that:

- the utility of the PRODUCTS does not outweigh the danger of developing ovarian cancer when the PRODUCTS are used in and around the perineal and/or perineum areas;
- the PRODUCTS are not reasonably fit, suitable or safe for their intended purpose (including for use in the perineal area or on the perineum), and the foreseeable risks far exceeded the

benefits associated with the design or formulation;

- the PRODUCTS contained inadequate warnings or instructions; and

- the PRODUCTS contained dangerous ingredients while feasible safer alternative designs and ingredients were available.

73.     Plaintiffs are informed and believe that, at all relevant times alleged herein, Defendants knew that the PRODUCTS were to be purchased and used without inspection for defects.

74.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, the PRODUCTS were and are unsafe for their intended use by reason of defects in the design so that they would not safely serve their purpose, but would instead expose the users of said PRODUCTS to serious injuries.

75.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, there were practical and feasible alternative designs, including cornstarch-based powders that would have prevented and/or significantly reduced the risk of Decedent's injuries, without impairing the reasonably anticipated or intended function of the PRODUCTS.  These safer alternative designs were economically and technologically feasible and would have prevented and/or significantly reduced the risk of Decedent's injuries without substantially impairing utility.

76.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, the PRODUCTS were substantially in the same condition as when they left the possession of Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC.

77.     At all pertinent times, Decedent used the PRODUCTS to powder her genitals and perineum which are reasonably foreseeable and normally intended uses by Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., as said Defendants gave no warnings in opposition, but rather, promoted use all over a woman's body.

78.     At all relevant times alleged herein, the design of the PRODUCTS was a substantial factor in causing harm to Decedent.

79.     As a legal and proximate result of the aforementioned defects in the design of the

1  PRODUCTS, Plaintiffs and Decedent sustained the injuries and damages as alleged herein.

2       80.     On information and belief, as a proximate result of the conduct, acts, and omissions

3  alleged herein, Plaintiffs and Decedent have suffered economic and noneconomic damages as alleged

4  herein.

5  **THIRD CAUSE OF ACTION**

6  **STRICT LIABILITY- DESIGN DEFECT - CONSUMER EXPECTATION TEST**

7       81.     Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint.

8       82.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

9  alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC.

10  F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. are the manufacturers, distributors,

11  and suppliers of the PRODUCTS, which are within the ordinary experience and understanding of a

12  consumer.  A consumer may reasonably believe that said PRODUCTS are designed to be and may be

13  applied to the body, without causing significant harm.

14       83.     California law allows a design defect claim to be proved either consumer expectations test

15  or the risk utility test.  As stated by the California Supreme Court: "Notably, the Third Restatement

16  rejects the consumer expectations test for proving design defect liability.  (See Rest.3d Torts, Products

17  Liability, § 2, com. g, pp. 27–28.)  This position is contrary to California law, which allows a design

18  defect to be shown by either the consumer expectations or the risk utility test.  (See ante, 202 Cal.Rptr.3d

19  at p. 469, 370 P.3d at p. 1033; *Barker*, supra, 20 Cal.3d at p. 432, 143 Cal.Rptr. 225, 573 P.2d 443.)  The

20  present case concerns only failure to warn, and we express no view on design defect liability." *Webb v.*

21  *Special Elec. Co., Inc.* (2016) 63 Cal.4th 167, 184 fn 8.

22       84.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

23  alleged herein, the PRODUCTS were defective in design or formulation in that, they did not perform as

24  safely as an ordinary consumer would have expected them to perform when used or misused in an

25  intended or reasonably foreseeable way, and they were unreasonably dangerous, and more dangerous

26  than an ordinary consumer would expect.

27       85.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

28  alleged herein, said PRODUCTS were inherently dangerous and harmful for their intended use, contrary

to ordinary consumer expectations.

86.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, as a result of the defective condition of the PRODUCTS, Plaintiffs and Decedent suffered injuries and damages as herein alleged, and the failure of the PRODUCTS to perform safely was a substantial factor in causing Plaintiffs' and Decedent's harm.

87.     On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiffs and Decedent have suffered economic and noneconomic damages as alleged herein.

88.     On information and belief, at all relevant times alleged herein, Plaintiffs' and Decedent's injuries occurred while the PRODUCTS were being used in an intended and reasonably foreseeable manner, and Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. were aware of and intended that the PRODUCTS would be used in the manner in which the materials were actually used.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

### (Against the JOHNSON & JOHNSON Defendants)

89.     Plaintiffs hereby incorporate each of the preceding paragraphs as if fully set forth herein.

90.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. were negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the PRODUCTS in one or more of the following respects:

- failing to warn Decedent of the hazards associated with the use of the PRODUCTS;
- failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;
- failing to properly test their PRODUCTS to determine the increased risk of ovarian cancer during the normal and/or intended use of the PRODUCTS;
- failing to inform ultimate users, such as Decedent, as to the safe and proper methods of

24

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

handling and using the PRODUCTS;

- failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

- failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of ovarian cancer;

- failing to inform the public in general and the Decedent in particular of the known dangers of using the PRODUCTS for dusting the perineum;

- failing to advise users how to prevent or reduce exposure that caused increased risk for ovarian cancer;

- marketing and labeling the PRODUCTS as safe for all uses despite knowledge to the contrary; and

- failing to act as a reasonably prudent company under similar circumstances.

91.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. knew, or reasonably should have known that users, including Decedent, would not realize the dangers of using the PRODUCTS, and a reasonable manufacturer, distributor and/or seller under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the PRODUCTS.

92.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiffs and Decedent.

93.     On information and belief, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used or misused in a reasonably foreseeable manner.

94.     On information and belief, as a direct and proximate result of the Defendants' negligence in one or more of the aforementioned ways, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately or were a substantial factor in causing Decedent to develop ovarian cancer.

95.     On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiffs and Decedent have suffered economic and noneconomic damages as alleged herein.

## FIFTH CAUSE OF ACTION

### DECEIT BY CONCEALMENT - CALIFORNIA *CIVIL CODE* §§ 1709, 1710

#### (Against the JOHNSON & JOHNSON Defendants)

96.     Plaintiffs hereby incorporate each of the preceding paragraphs as if fully set forth herein.

97.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., from the time that the PRODUCTS were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, willfully deceived the Plaintiffs, Decedent and the public in general, by concealing from them, the true facts concerning the PRODUCTS, which the said Defendants had a duty to disclose.

98.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. conducted a sales and marketing campaign to promote the sale of the PRODUCTS and willfully deceived the Plaintiffs, Decedent and the public in general as to the health risks and consequences of the use of the PRODUCTS, which included, but was not limited to, the following false, deceptive, misleading, and untruthful advertisements, public statements, marketing campaigns, and promotions:

- failing to disclose or warn Decedent of the hazards associated with the use of the PRODUCTS;
- failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;
- failing to properly test their PRODUCTS to determine the increased risk of ovarian cancer during the normal and/or intended use of the PRODUCTS;
- failing to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using the PRODUCTS;

- failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

- failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of ovarian cancer;

- failing to disclose to the public in general and the Decedent in particular the known dangers of using the PRODUCTS for dusting the perineum;

- failing to advise users how to prevent or reduce exposure that caused increased risk for ovarian cancer;

- marketing and labeling the PRODUCTS as safe for all uses despite knowledge to the contrary; and

- failing to act like a reasonably prudent company under similar circumstances.

99.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC. were aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for use as intended.  Furthermore, said Defendants were aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS carry a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Plaintiffs and Decedent as alleged herein.

100.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, that Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC. intentionally concealed and suppressed the true facts concerning the PRODUCTS with the intent to defraud the Decedent, other consumers, and the public in general, in that said Defendants knew that Decedent would not have used the PRODUCTS if she had known the true facts concerning the risks and dangers of the PRODUCTS.

101.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, that as a result of the foregoing fraudulent and deceitful conduct by Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., Plaintiffs and Decedent suffered injuries and damages as alleged herein.

102.    On information and belief, as a proximate result of the conduct, acts, and omissions

alleged herein, Plaintiffs and Decedent have suffered economic and noneconomic damages as alleged herein.

<b><u>SIXTH CAUSE OF ACTION</u></b>

<b><u>SURVIVAL ACTION</u></b>

<b>(Plaintiff DEVRA HUTCHINSON as Successor in Interest and Personal Representative of the ESTATE OF NAOMI LYDIA, Against All Defendants)</b>

103.    Plaintiff DEVRA HUTCHINSON, as Personal Representative of the ESTATE OF NAOMI LYDIA and as Successor in Interest of NAOMI LYDIA, hereby incorporates each of the preceding paragraphs as if fully set forth herein.

104.    Plaintiff DEVRA HUTCHINSON asserts a survivor claim on behalf of Decedent, pursuant to California Code of Civil Procedure § 377, *et seq.*  Plaintiff DEVRA HUTCHINSON succeeds to causes of action that may have been brought by Decedent.

105.    Prior to her death, Decedent NAOMI LYDIA suffered and incurred substantial loss and damages, including but not limited to medical and hospital expenses, and past and future lost earnings, as a direct and proximate result of each Defendants' malice, oppression, fraud, negligence, carelessness, recklessness, wantonness, and unlawfulness.

106.    Further, as a direct and proximate result of each Defendants' malice, oppression, fraud, negligence, carelessness, recklessness, wantonness, and unlawfulness, Plaintiffs incurred funeral and burial expenses.

107.    Additionally, in performing the foregoing acts and omissions, Defendants, and each of them, acted despicably, fraudulently, and with malice and oppression so as to justify an award of punitive and exemplary damages.

<b><u>SEVENTH CAUSE OF ACTION</u></b>

<b><u>WRONGFUL DEATH</u></b>

<b>(Plaintiffs DEVRA HUTCHINSON and GARY LYDIA, Against All Defendants)</b>

108.    Plaintiffs DEVRA HUTCHINSON and GARY LYDIA, individually, hereby incorporate each of the preceding paragraphs as if fully set forth herein.

109.    As a direct and proximate of each Defendants' negligence, carelessness, recklessness,

1   wantonness, and unlawfulness, Decedent NAOMI LYDIA suffered fatal injuries, and Plaintiffs DEVRA

2   HUTCHINSON and GARY LYDIA bring causes of action as wrongful death causes of action pursuant to

3   California Code of Civil Procedure § 377.60.

4          110.   As a further direct and proximate result of each Defendants' negligence, carelessness,

5   recklessness, wantonness, and unlawfulness, Plaintiffs DEVRA HUTCHINSON and GARY LYDIA have

6   suffered economic damages, including but not limited to monetary contributions and financial support from

7   Decedent, loss of gifts or benefits, funeral and burial expenses, and household services, noneconomic

8   damages, including but not limited to being deprived of the love, affection, solace, companionship, society,

9   moral support, assistance, protection, training and guidance, services, comfort, care, counsel, and advice of

10  Decedent, and any other damages as permitted by law.

11                  **TOLLING STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES**

12         111.   Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint.

13         112.   Decedent NAOMI LYDIA suffered illnesses that have latency periods and do not arise

14  until many years after exposure.  Decedent's illness did not distinctly manifest as having been caused by

15  the PRODUCTS until Plaintiffs was made aware that the ovarian cancer could be caused by use of the

16  PRODUCTS.  Consequently, the discovery rule applies to this case and the statute of limitations has been

17  tolled until the day that Plaintiffs knew or had reason to know that ovarian cancer was linked to the use of

18  the PRODUCTS.

19         113.   Furthermore, the running of any statute of limitations has been equitably tolled by reason

20  of Defendants' fraudulent concealment and conduct.  Through their affirmative misrepresentations and

21  omissions, Defendants actively concealed from Plaintiffs and Decedent the true risks associated with the

22  talcum powder contained within the PRODUCTS.

23         114.   As a result of Defendants' actions, Plaintiffs and Decedent were unaware, and could not

24  reasonably know, or could not have reasonably learned through reasonable diligence, that Decedent had

25  been exposed to the risks alleged herein and that those risks were the direct and proximate result of

26  Defendants' acts and omissions.

27         115.   Furthermore, Defendants are estopped from relying on any statute of limitations because

28  of their concealment of the truth, quality and nature of the PRODUCTS.  Defendants were under a duty

to disclose the true character, quality and nature of PRODUCTS because this was non-public information which the Defendants had and continue to have in their exclusive control, and because the Defendants knew that this information was not available to Plaintiffs or Decedent.

116.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable PRODUCTS, notwithstanding the known or reasonably known risks.  Decedent and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

117.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, in representations to the Decedent and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

- that the PRODUCTS were not as safe as other products available;
- that the PRODUCTS were dangerous; and
- that the PRODUCTS were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

118.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants were under a duty to disclose to Decedent, and the public in general, the defective nature of the PRODUCTS.

119.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants made the misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS with the intention and specific desire to induce the consumers, including the Decedent, to rely on such misrepresentations in selecting, purchasing and using the PRODUCTS.

120.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants made these misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS in the labeling, advertising, promotional material or other marketing efforts.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

121.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, these representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

122.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, the misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, their sales representative, employees, distributors, agents, marketers and detail persons.

123.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, at the time the representations were made, Plaintiffs and the Decedent did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the PRODUCTS. Plaintiffs did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiffs discover the false representations of Defendants, nor would Plaintiffs with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

124.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants knew that Plaintiffs and Decedent, and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the PRODUCTS, as set forth herein.

125.    Had Decedent known the true facts about the dangers and serious health and/or safety risks of the PRODUCTS, Decedent would not have purchased, used, or relied on Defendants' PRODUCTS.

126.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, including Decedent.

127.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, the information distributed to the public, Plaintiffs and Decedent by Defendants included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

of the PRODUCTS.

128.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiffs and the Decedent, regarding the safety of the PRODUCTS, specifically that the PRODUCTS did not have dangerous and/or serious adverse health safety concerns, and that the PRODUCTS were as safe as other products.

129.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants' intent and purpose in making these misrepresentations was to deceive the Decedent; to gain the confidence of the public, the medical community, and Decedent, to falsely assure them of the quality and fitness for use of the PRODUCTS; and induce Decedent and the public to use the PRODUCTS.

130.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the PRODUCTS to the public at large, for the purpose of influencing the sales of PRODUCTS known to be dangerous and defective, and/or not as safe as other alternatives.

131.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, at all times relevant to this action, Defendants knew that the PRODUCTS were not safe for consumers.

132.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, the misrepresentations and active concealment by Defendants constitute a continuing tort. Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the PRODUCTS.

133.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, as a result of the Defendants' advertising and marketing efforts, and representations, the PRODUCTS are and continue to be pervasively manufactured and used in California and throughout the United States.

134.    Plaintiffs are informed and believe, and based thereon allege, at all relevant times alleged

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1  herein, the acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this

2  Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights

3  of Decedent and other users of the PRODUCTS and for the primary purpose of increasing Defendants'

4  profits from the sale and distribution of the PRODUCTS.  Defendants' outrageous and unconscionable

5  conduct warrants an award of exemplary and punitive damages against each Defendant in an amount

6  appropriate to punish and make an example of each Defendant.

7       135.  Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

8  alleged herein, prior to the manufacturing, sale and distribution of the PRODUCTS, Defendants, and

9  each of them, knew that the PRODUCTS were in a defective condition as previously alleged herein and

10 knew that those who used the PRODUCTS would experience and did experience severe injuries.

11 Further, Defendants and each of them through its officers, directors, managers, and agents, had

12 knowledge that the PRODUCTS presented a substantial and unreasonable risk of harm to the public,

13 including Decedent and, as such, consumers of the PRODUCTS were unreasonably subjected to risk of

14 injury.

15      136.  Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

16 alleged herein, despite such knowledge, Defendants, and each of them, acting through its officers,

17 directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and

18 deliberately failed to remedy the known defects in the PRODUCTS and failed to warn the public,

19 including the Decedent, of the extreme risk of injury occasioned by said defects inherent in the

20 PRODUCTS.  Defendants and their individual agents, officers, and directors intentionally proceeded with

21 the manufacturing, sale, distribution and marketing of the PRODUCTS knowing that the public,

22 including Decedent, would be exposed to serious danger in order to advance Defendants' own pecuniary

23 interest and monetary profits.

24      137.  Plaintiffs are informed and believe, and based thereon allege that, at all relevant times

25 alleged herein, Defendants' conduct was despicable, and so contemptible that it would be looked down

26 upon and despised by ordinary decent people, and was carried on by Defendants with willful and

27 conscious disregard for safety, entitling Plaintiffs to exemplary damages under California Civil Code

28 section 3294.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

138.     Plaintiffs filed this lawsuit within the applicable limitations period of first suspecting that the PRODUCTS were the cause of any appreciable harm sustained by Decedent, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries.  Plaintiffs could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known.  Plaintiffs did not suspect, nor did they have reason to suspect, that wrongdoing had caused the injuries until recently.  Plaintiffs filed the original action within two years of discovering the causes of action and identities of Defendants.

139.     Plaintiffs had no knowledge of the defects in the PRODUCTS or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiffs have access to information regarding other injuries and complaints in the possession of Defendants.  Additionally, Plaintiffs were prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the PRODUCTS are safe and free from defects, and Defendants fraudulently concealed information to allow Plaintiffs to discover a potential cause of action sooner.

140.     Plaintiffs have reviewed their potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state-law.  Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.  Plaintiffs choose to only pursue claims based on state law and is not making any claims that raise federal questions.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for judgment against Defendants JOHNSON & JOHNSON, JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., jointly and severally, and as appropriate to each cause of action alleged and the standing of Plaintiffs as follows:

1.     For general damages according to proof at trial, including but not limited to loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training and guidance of Decedent.

2.      For special damages according to proof at trial, including but not limited to medical, emergency services, coroner, funeral, burial and related expenses; the loss of financial support Decedent would have contributed to the family; the loss of gifts or benefits that Plaintiffs would have expected to receive from Decedent; the reasonable value of household services that Decedent would have provided; and any other pecuniary losses according to proof at trial.

3.      Punitive or exemplary damages according to proof at the time of trial;

4.      Attorney's fees;

5.      For costs of suit incurred herein;

6.      For pre-judgment interest as provided by law; and

7.      For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all counts in this Complaint.

Respectfully submitted,

Dated:  July 23, 2020                              MARY ALEXANDER & ASSOCIATES, PC


By:  _____
          Mary E. Alexander, Esq.
          Brendan D.S. Way, Esq.
          Catalina S. Muñoz, Esq.
          *Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| MARY E. ALEXANDER (SBN 104173)<br>BRENDAN D.S. WAY (SBN 261705)<br>MARY ALEXANDER & ASSOCIATES, P.C.<br>44 Montgomery Street, Suite 1303<br>San Francisco, CA 94104 | |

TELEPHONE NO.: (415) 433-4440   FAX NO.: (415) 433-5440

ATTORNEY FOR *(Name):* Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

**ENDORSED
FILED
ALAMEDA COUNTY**

**JUL 24 2020**

CLERK OF THE SUPERIOR COURT
By _____
Deputy

CASE NAME: Hutchinson, et al. v. Johnson & Johnson, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited   [ ] Limited<br>(Amount demanded exceeds $25,000)   (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **RG20068771**<br>JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [X] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive

4. Number of causes of action *(specify):* Seven

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 23, 2020

MARY E. ALEXANDER
(TYPE OR PRINT NAME)

▶ *(signature)* Mary E. Alexander
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET**<br>Legal<br>Solutions<br>& Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                                    **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
 Auto (22)—Personal Injury/Property
  Damage/Wrongful Death
 Uninsured Motorist (46) *(if the*
  *case involves an uninsured*
  *motorist claim subject to*
  *arbitration, check this item*
  *instead of Auto)*
**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
 Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
   Wrongful Death
 Product Liability *(not asbestos or*
  *toxic/environmental)* (24)
 Medical Malpractice (45)
  Medical Malpractice–
   Physicians & Surgeons
  Other Professional Health Care
   Malpractice
 Other PI/PD/WD (23)
  Premises Liability (e.g., slip
   and fall)
  Intentional Bodily Injury/PD/WD
   (e.g., assault, vandalism)
  Intentional Infliction of
   Emotional Distress
  Negligent Infliction of
   Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
 Business Tort/Unfair Business
  Practice (07)
 Civil Rights (e.g., discrimination,
  false arrest) *(not civil*
  *harassment)* (08)
 Defamation (e.g., slander, libel)
  (13)
 Fraud (16)
 Intellectual Property (19)
 Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
   *(not medical or legal)*
 Other Non-PI/PD/WD Tort (35)
**Employment**
 Wrongful Termination (36)
 Other Employment (15)

**Contract**
 Breach of Contract/Warranty (06)
  Breach of Rental/Lease
   Contract *(not unlawful detainer*
   *or wrongful eviction)*
  Contract/Warranty Breach—Seller
   Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
   Warranty
  Other Breach of Contract/Warranty
 Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections
   Case
 Insurance Coverage *(not provisionally*
  *complex)* (18)
  Auto Subrogation
  Other Coverage
 Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
 Eminent Domain/Inverse
  Condemnation (14)
 Wrongful Eviction (33)
 Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent*
   *domain, landlord/tenant, or*
   *foreclosure)*
**Unlawful Detainer**
 Commercial (31)
 Residential (32)
 Drugs (38) *(if the case involves illegal*
  *drugs, check this item; otherwise,*
  *report as Commercial or Residential)*
**Judicial Review**
 Asset Forfeiture (05)
 Petition Re: Arbitration Award (11)
 Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
   Case Matter
  Writ–Other Limited Court Case
   Review
 Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
   Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
 Antitrust/Trade Regulation (03)
 Construction Defect (10)
 Claims Involving Mass Tort (40)
 Securities Litigation (28)
 Environmental/Toxic Tort (30)
 Insurance Coverage Claims
  *(arising from provisionally complex*
  *case type listed above)* (41)
**Enforcement of Judgment**
 Enforcement of Judgment (20)
  Abstract of Judgment (Out of
   County)
  Confession of Judgment *(non-*
   *domestic relations)*
  Sister State Judgment
  Administrative Agency Award
   *(not unpaid taxes)*
  Petition/Certification of Entry of
   Judgment on Unpaid Taxes
  Other Enforcement of Judgment
   Case
**Miscellaneous Civil Complaint**
 RICO (27)
 Other Complaint *(not specified*
  *above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-*
   *harassment)*
  Mechanics Lien
  Other Commercial Complaint
   Case *(non-tort/non-complex)*
  Other Civil Complaint
   *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
 Partnership and Corporate
  Governance (21)
 Other Petition *(not specified*
  *above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
   Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late
   Claim
  Other Civil Petition

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:** JOHNSON & JOHNSON, a New Jersey
*(AVISO AL DEMANDADO):* corporation doing business in
California;JOHNSON & JOHNSON CONSUMER INC. F/K/A
JOHNSON & JOHNSON CONSUMER COMPANIES, INC., a New
Jersey corporation doing business in California; and
DOES 1 through 100, inclusive

**ENDORSED
FILED
ALAMEDA COUNTY**

JUL 24 2020

CLERK OF THE SUPERIOR COURT
By _CROGERS_
Deputy

**YOU ARE BEING SUED BY PLAINTIFF:** DEVRA HUTCHINSON,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Individually, as
Personal Representative of the ESTATE OF NAOMI LYDIA and
as Successor in Interest of NAOMI LYDIA; GARY LYDIA,
Individually and as Successor in Interest of NAOMI LYDIA

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* RG 20068771 |
|---|---|

Alameda County Superior Court
1225 Fallon Street
Oakland, CA 94612

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
MARY E. ALEXANDER                                    (415) 433-4440  (415) 433-5440
MARY ALEXANDER & ASSOCIATES, P.C.
44 Montgomery Street, Suite 1303
San Francisco, CA 94104

| DATE: *(Fecha)* JUL 24 2020 | Clerk, by _CROGERS_ *(Secretario)* | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* JOHNSON & JOHNSON, a New Jersey corporation doing business in California
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
            ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
            ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
            ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100  [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

**NOTICE TO DEFENDANT:** JOHNSON & JOHNSON, a New Jersey
*(AVISO AL DEMANDADO):* corporation doing business in
California;JOHNSON & JOHNSON CONSUMER INC. F/K/A
JOHNSON & JOHNSON CONSUMER COMPANIES, INC., a New
Jersey corporation doing business in California; and
DOES 1 through 100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:** DEVRA HUTCHINSON,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Individually, as
Personal Representative of the ESTATE OF NAOMI LYDIA and
as Successor in Interest of NAOMI LYDIA; GARY LYDIA,
Individually and as Successor in Interest of NAOMI LYDIA

| FOR COURT USE ONLY |
| --- |
| *(SOLO PARA USO DE LA CORTE)* |

ENDORSED
FILED
ALAMEDA COUNTY

JUL 24 2020

CLERK OF THE SUPERIOR COURT
By C. ROGERS
Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Alameda County Superior Court
1225 Fallon Street
Oakland, CA 94612

| CASE NUMBER: |
| --- |
| *(Número de Caso)* |
| RG20068771 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
MARY E. ALEXANDER                    (415) 433-4440   (415) 433-5440
MARY ALEXANDER & ASSOCIATES, P.C.
44 Montgomery Street, Suite 1303
San Francisco, CA 94104

DATE:                               Clerk, by C. ROGERS                    , Deputy
*(Fecha)*  JUL 24 2020              *(Secretario)*                          *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* JOHNSON & JOHNSON CONSUMER, INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., a New Jersey corporation doing business in California

   under: ☒ CCP 416.10 (corporation)              ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100  [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

MARY E. ALEXANDER, ESQ. (SBN: 104173)
BRENDAN D.S. WAY, ESQ. (SBN: 261705)
CATALINA S. MUÑOZ, ESQ. (SBN: 317856)
MARY ALEXANDER & ASSOCIATES, P.C.
44 Montgomery Street, Suite 1303
San Francisco, CA 94104
Telephone: (415) 433-4440
Facsimile: (415) 433-5440

Attorneys for Plaintiffs

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

**JUL 24 2020**

CLERK OF THE SUPERIOR COURT
By _____
                                    Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

DEVRA HUTCHINSON, Individually, as Personal
Representative of the ESTATE OF NAOMI LYDIA
and as Successor in Interest of NAOMI LYDIA;
GARY LYDIA, Individually and as Successor in
Interest of NAOMI LYDIA,

        Plaintiffs,

v.

JOHNSON & JOHNSON, a New Jersey
corporation doing business in California;
JOHNSON & JOHNSON CONSUMER INC.
F/K/A JOHNSON & JOHNSON CONSUMER
COMPANIES, INC., a New Jersey corporation
doing business in California; and
DOES 1 through 100, inclusive,

        Defendants.

Case No. **RG20068771**

**DECLARATION OF DEVRA
HUTCHINSON PURSUANT TO
C.C.P. SECTION 377.32**

Filed By Fax

COMES NOW Plaintiff, DEVRA HUTCHINSON (hereinafter "Declarant") individually and as successor in interest of Decedent NAOMI LYDIA, in the above-captioned action and submits this Declaration pursuant to Code of Civil Procedure § 377.32.

I, DEVRA HUTCHINSON, hereby state and declare as follows:

1.      I am a Plaintiff in the above-captioned action.  I have personal knowledge of the matters stated in this declaration except those matters stated on information and belief and, if called upon as a witness; I could and would competently testify thereto.

2.      The Decedent's name is NAOMI LYDIA and referred to herein as NAOMI.  NAOMI was my mother.

3.      NAOMI died in the County of Alameda on May 1, 1998.

4.      There is no proceeding pending in California for administration of NAOMI's estate.

5.      Declarant is authorized to act on behalf of NAOMI's successors in interest (as defined in Section 377.11 of the California Code of Civil Procedure) with respect to NAOMI's interest in the action or proceeding.

6.      The facts supporting the statement in Paragraph 5 above are as follows:  Declarant is NAOMI's successor in interest of NAOMI's estate.

7.      No other person has a superior right to commence the action or proceeding or to be substituted for NAOMI in the pending action or proceeding.

8.      A true and correct copy of NAOMI's death certificate is attached.

The Declarant affirms or declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed July 21, 2020, in Oakland, California.

_Devra Hutchinson_
DEVRA HUTCHINSON

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

## OFFICE OF CLERK-RECORDER
# COUNTY OF ALAMEDA
### OAKLAND, CALIFORNIA
### CERTIFICATE OF DEATH
STATE OF CALIFORNIA
USE BLACK INK ONLY—NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11 (REV. 7/97)

3 051998 072963          3199801003199

| STATE FILE NUMBER | | LOCAL REGISTRATION NUMBER |
|---|---|---|

**DECEDENT PERSONAL DATA**

| 1. NAME OF DECEDENT—FIRST (GIVEN) | 2. MIDDLE | 3. LAST (FAMILY) |
|---|---|---|
| NAOMI | BELL | LYDIA |

| 4. DATE OF BIRTH MM/DD/CCYY | 5. AGE YRS. | IF UNDER 1 YEAR MONTHS/DAYS | IF UNDER 24 HOURS HOURS/MINUTES | 6. SEX | 7. DATE OF DEATH MM/DD/CCYY | 8. HOUR |
|---|---|---|---|---|---|---|
| 02/23/1923 | 75 | | | F | 05/01/1998 | 0700 |

| 9. STATE OF BIRTH | 10. SOCIAL SECURITY NO. | 11. MILITARY SERVICE | 12. MARITAL STATUS | 13. EDUCATION—YEARS COMPLETED |
|---|---|---|---|---|
| OK | 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 | Yes / No [X] UNK | WIDOWED | 16 |

| 14. RACE | 15. HISPANIC—SPECIFY | 16. USUAL EMPLOYER |
|---|---|---|
| BLACK 20 | Yes / [X] No | CALIFORNIA PUBLIC SCHOOLS |

| 17. OCCUPATION | 18. KIND OF BUSINESS | 19. YEARS IN OCCUPATION |
|---|---|---|
| RETIRED NURSE | SCHOOL NURSE | 50 |

**USUAL RESIDENCE**

| 20. RESIDENCE—(STREET AND NUMBER OR LOCATION) |
|---|
| 5624 EAST 16TH STREET |

| 21. CITY | 22. COUNTY | 23. ZIP CODE | 24. YRS IN COUNTY | 25. STATE OR FOREIGN COUNTRY |
|---|---|---|---|---|
| OAKLAND | ALAMEDA | 94621 | 50 | CA |

**INFORMANT**

| 26. NAME, RELATIONSHIP | 27. MAILING ADDRESS (STREET AND NUMBER OR RURAL ROUTE NUMBER, CITY OR TOWN, STATE, ZIP) |
|---|---|
| DEVRA HUTCHINSON—DAUGHTER | 5624 EAST 16th ST., OAKLAND, CA 94621 |

**SPOUSE AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE—FIRST | 29. MIDDLE | 30. LAST (MAIDEN NAME) |
|---|---|---|
| - | - | - |

| 31. NAME OF FATHER—FIRST | 32. MIDDLE | 33. LAST | 34. BIRTH STATE |
|---|---|---|---|
| CHARLIE | J. | TIPTON | TX |

| 35. NAME OF MOTHER—FIRST | 36. MIDDLE | 37. LAST (MAIDEN) | 38. BIRTH STATE |
|---|---|---|---|
| NAOMI | IRENE | SALTERS | OK |

**DISPOSITION(S)**

| 39. DATE MM/DD/CCYY | 40. PLACE OF FINAL DISPOSITION |
|---|---|
| 05/02/1998 | TRICE HILL CEMETERY, OKLAHOMA CITY, OK |

| 41. TYPE OF DISPOSITION(S) | 42. SIGNATURE OF EMBALMER | 43. LICENSE NO. |
|---|---|---|
| TR/BU | Cunningham | 7283 |

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

| 44. NAME OF FUNERAL DIRECTOR | 45. LICENSE NO. | 46. SIGNATURE OF LOCAL REGISTRAR | 47. DATE MM/DD/CCYY |
|---|---|---|---|
| AFFORDABLE BURIAL AND CREMATION CNTR CUNNINGHAM'S FD-1532 | | MA | 05/01/1998 DM |

**PLACE OF DEATH**

| 101. PLACE OF DEATH | 102. IF HOSPITAL, SPECIFY ONE: | 103. FACILITY OTHER THAN HOSPITAL | 104. COUNTY |
|---|---|---|---|
| OWN RESIDENCE | IP / ER/OP / DOA | CONV. HOSP. / RES. CARE / OTHER | ALAMEDA |

| 105. STREET ADDRESS—(STREET AND NUMBER OR LOCATION) | 106. CITY |
|---|---|
| 5624 E. 16TH STREET | OAKLAND |

**CAUSE OF DEATH**

107. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, C, AND D)

| | | TIME INTERVAL BETWEEN ONSET AND DEATH | 108. DEATH REPORTED TO CORONER |
|---|---|---|---|
| IMMEDIATE CAUSE (A) | CARDIOPULMONARY ARREST | MINUTES | Yes [X] No REFERRAL NUMBER |
| DUE TO (B) | OVARIAN CANCER | YEARS | 109. BIOPSY PERFORMED Yes / [X] No |
| DUE TO (C) | | | 110. AUTOPSY PERFORMED Yes / [X] No |
| DUE TO (D) | | | 111. USED IN DETERMINING CAUSE Yes / No |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF YES, LIST TYPE OF OPERATION AND DATE. |
|---|
| NO |

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWL-EDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. DECEDENT ATTENDED SINCE MM/DD/CCYY | OCCIDENT LAST SEEN ALIVE MM/DD/CCYY | 115. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NO. | 117. DATE MM/DD/CCYY |
|---|---|---|---|---|
| 09/11/1995 | 04/27/1998 | | G54120 | 05/01/1998 |

| 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP |
|---|
| E.J. COHEN    3801 HOWE ST., OAKLAND, CA 94611 |

**CORONER'S USE ONLY**

| I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. 119. MANNER OF DEATH | 120. INJURY AT WORK | 121. INJURY DATE MM/DD/CCYY | 122. HOUR | 123. PLACE OF INJURY |
|---|---|---|---|---|
| NATURAL / SUICIDE / HOMICIDE / ACCIDENT / PENDING INVESTIGATION / COULD NOT BE DETERMINED | Yes / No | | | |

| 124. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY) |
|---|
| |

| 125. LOCATION (STREET AND NUMBER OR LOCATION AND CITY, ZIP) |
|---|
| |

| 126. SIGNATURE OF CORONER OR DEPUTY CORONER | 127. DATE MM/DD/CCYY | 128. TYPED NAME, TITLE OF CORONER OR DEPUTY CORONER |
|---|---|---|
| | | |

**STATE REGISTRAR**

| A | B | C | D | E | F | G | H | FAX AUTH. # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|---|
| 8 | X | 2 | | | | | | 56216 | |

### CERTIFIED COPY OF VITAL RECORD
STATE OF CALIFORNIA, COUNTY OF ALAMEDA

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Alameda County Clerk-Recorder.

000153413

DATE ISSUED        AUG 2 4 2016

*Steve Manning*
STEVE MANNING
COUNTY CLERK-RECORDER

This copy is not valid unless prepared on an engraved border displaying the date, seal and signature of the Clerk-Recorder.

CAALAMEDD2





# Superior Court of California, County of Alameda
## Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

> The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial.  You may choose ADR by:
>
> - Indicating your preference on Case Management Form CM-110;
>
> - Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or
>
> - Agree to ADR at your Initial Case Management Conference.
>
> **QUESTIONS?**  Call (510) 891-6055. Email adrprogram@alameda.courts.ca.gov
> Or visit the court's website at http://www.alameda.courts.ca.gov/adr

### What Are The Advantages Of Using ADR?

- *Faster* –Litigation can take years to complete but ADR usually takes weeks or months.

- *Cheaper* – Parties can save on attorneys' fees and litigation costs.

- *More control and flexibility* – Parties choose the ADR process appropriate for their case.

- *Cooperative and less stressful* – In mediation, parties cooperate to find a mutually agreeable resolution.

- *Preserve Relationships* **–** A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

### What Is The Disadvantage Of Using ADR?

- *You may go to court anyway* – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

### What ADR Options Are Available?

- *Mediation* – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.

  - **Court Mediation Program**:  Mediators do not charge fees for the first two hours of mediation.  If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

o **Private Mediation**:  This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

• *Arbitration* – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute.  Arbitration is less formal than a trial and the rules of evidence are often relaxed.  Arbitration is effective when the parties want someone other than themselves to decide the outcome.

o **Judicial Arbitration Program** (non-binding):  The judge can refer a case or the parties can agree to use judicial arbitration.  The parties select an arbitrator from a list provided by the court.  If the parties cannot agree on an arbitrator, one will be assigned by the court.  There is no fee for the arbitrator.  The arbitrator must send the decision (award of the arbitrator) to the court.  The parties have the right to reject the award and proceed to trial.

o **Private Arbitration** (binding and non-binding) occurs when parties involved in a dispute either agree or are contractually obligated.  This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

## Mediation Service Programs In Alameda County

Low cost mediation services are available through non-profit community organizations.  Trained volunteer mediators provide these services.  Contact the following organizations for more information:

**SEEDS Community Resolution Center**
2530 San Pablo Avenue, Suite A, Berkeley, CA  94702-1612
Telephone: (510) 548-2377      Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our diverse communities – **S**ervices that **E**ncourage **E**ffective **D**ialogue and **S**olution-making.

**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA  94550
Telephone: (925) 373-1035      Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.

*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA  94607
Telephone: (510) 768-3100      Website: www.cceb.org
Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

**ALA ADR-001**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name, State Bar number, and address*): | *FOR COURT USE ONLY* |
|---|---|
| TELEPHONE NO.:                    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | |

**SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY**
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** | CASE NUMBER: |
|---|---|

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 24405 Amador Street, Hayward, CA 94544 or Fax to (510) 267-5727.

1. Date complaint filed: _____. An **Initial Case Management Conference** is scheduled for:

   Date:                          Time:                          Department:

2. Counsel and all parties certify they have met and conferred and have selected the following ADR process (*check one*):

   ☐ Court mediation          ☐ Judicial arbitration

   ☐ Private mediation        ☐ Private arbitration

3. All parties agree to complete ADR within 90 days and certify that:

   a. No party to the case has requested a complex civil litigation determination hearing;
   b. All parties have been served and intend to submit to the jurisdiction of the court;
   c. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
   d. Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
   e. Case management statements are submitted with this stipulation;
   f. All parties will attend ADR conferences; and,
   g. The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                                                     (SIGNATURE OF PLAINTIFF)

Date:

_____          ▶ _____

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

(TYPE OR PRINT NAME)                    (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

**ALA ADR-001**

| PLAINTIFF/PETITIONER: | CASE NUMBER.: |
|---|---|
| DEFENDANT/RESPONDENT: | |

Date:

_____        ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF DEFENDANT)

Date:

_____        ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF ATTORNEY FOR DEFENDANT)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

Mary Alexander & Associates, P.C.
Attn:  Alexander, Mary E.
44 Montgomery Street
Ste. 1303
San Francisco, CA   94104

Johnson & Johnson, a New Jersey
corporation

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Hutchinson<br>　　　　　　　　　　　　Plaintiff/Petitioner(s)<br>　　　　　　　VS.<br><br>Johnson & Johnson, a New Jersey corporation<br>　　　　　　　　　　　Defendant/Respondent(s)<br>　　　　　　　　(Abbreviated Title) | No. <u>RG20068771</u><br><br><br>NOTICE OF HEARING |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

　　　　　　　Complex Determination Hearing
　　　　　　　Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE:  09/22/2020    TIME:  03:00 PM    DEPARTMENT:  23
LOCATION:  Administration Building, Fourth Floor
　　　　　　　1221 Oak Street, Oakland

Case Management Conference:
DATE:  11/10/2020    TIME:  03:00 PM    DEPARTMENT:  23
LOCATION:  Administration Building, Fourth Floor
　　　　　　　1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 23 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6939.  Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 23.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions.  Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to **Direct Calendar Departments** at

**http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 23.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 23 by e-mail at Dept.23@alameda.courts.ca.gov or by phone at (510) 267-6939.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated:  08/06/2020          Chad Finke  Executive Officer / Clerk of the Superior Court

                          By _____

                                                          Deputy Clerk

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 08/07/2020.

                          By _____

                                                          Deputy Clerk

Mary Alexander & Associates, P.C.
Attn: Alexander, Mary E.
44 Montgomery Street
Ste. 1303
San Francisco, CA   94104

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Hutchinson | No. RG20068771 |
| Plaintiff/Petitioner(s) | |
| | Order |
| VS. | |
| | Complaint - Product Liability |
| Johnson & Johnson, a New Jersey corporation | |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

The Complaint - Product Liability was set for hearing on 09/22/2020 at 03:00 PM in Department 23 before the Honorable Brad Seligman. The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

Case continued to 03:00 PM on 10/20/2020 in Department 23, Complex Determination Hearing, Administration Building, 1221 Oak Street, Oakland.

Dated: 09/22/2020

CourtroomClerk Jhalisa Castaneda

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG20068771
Order After Hearing Re: of 09/22/2020

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the
foregoing document was mailed first class, postage prepaid, in a sealed envelope,
addressed as shown on the foregoing document or on the attached, and that the
mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 09/25/2020.
Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

digital

Deputy Clerk

**Superior Court of California, County of Alameda**
**Rene C. Davidson Alameda County Courthouse**

| | |
|---|---|
| Hutchinson<br><br>                            Plaintiff/Petitioner(s)<br><br>          VS.<br><br>Johnson & Johnson, a New Jersey corporation<br><br>                     Defendant/Respondent(s)<br>                    (Abbreviated Title) | No. <u>RG20068771</u><br><br>Case Management Order<br><br>Date:  11/10/2020<br>Time:  03:00 PM<br>Dept:  23<br>Judge:  Brad Seligman |

ORDER re: CASE MANAGEMENT

The Court has ordered the following after review of the case, including timely filed Case Management Statements, without a conference.

FURTHER CONFERENCE

A further Case Management Conference is scheduled for 02/09/2021 at 03:00 PM in Dept. 23.

Counsel and self-represented litigants are reminded to check the court's register of action before appearing at any case management conference at least two days before any scheduled appearance to determine if the court has issued a tentative case management order.  If published, this tentative case management order will become the order of the Court unless counsel or self-represented party notifies the Court and opposing counsel/self-represented party by email not less than one court day prior to the CMC that s/he intends to appear in person at the CMC to discuss some aspect of the order, and specifies the nature of the party's concern. (Please note that the Tentative Rulings postings on the website is for tentative rulings on law and motion matters and will not display tentative Case Management Orders. The tentative Case Management Orders are found in the Register of Action). The court may be reached at Dept.23@alameda.courts.ca.gov.

Plaintiff and Defense Counsel shall file Updated Case Management Statements (preferably joint) in compliance with CRC § 3.725, preferably on pleading paper rather than on Judicial Council Form CM-110,  no later than five (5) court days prior to the CMC.  PARTIES ARE STRONGLY ENCOURAGED TO SERVE COURTESY COPIES ON THE COURT VIA EMAIL TO CLERK BECAUSE OF DELAYS IN SCANNING AS A RESULT OF BUDGET SHORTFALLS IN ALAMEDA COUNTY.

NOTICES

The Court orders counsel and/or self-represented parties to obtain a copy of this order from the court's website  http://www.alameda.courts.ca.gov/domainweb.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to CCP 177.5.

Dated:  11/10/2020

*facsimile*

Judge Brad Seligman

1  Mark P. Robinson, Jr., Esq. Bar # 054426
2  Karen L. Karavatos, Esq., Bar # 131718
   **ROBINSON CALCAGNIE, INC.**
3  19 Corporate Plaza Drive
   Newport Beach, CA 92660
4  949-720-1288; Fax 949-720-1292
   mrobinson@robinsonfirm.com
5  kkaravatos@robinsonfirm.com

6  **Attorneys for JCCP Petitioners**

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **FOR THE COUNTY OF LOS ANGELES**

10

11  **COORDINATION PROCEEDING SPECIAL**        )   **JCCP NO. 4872**
    **TITLE (Rule 3.550)**                      )
12                                              )   Judge: Hon. Daniel J. Buckley
                                                )   SSC-1
13  **JOHNSON & JOHNSON TALCUM**                )
    **POWDER CASES**                            )   [This document relates to:
14  _____        )   37-2020-00000905; RG20068771]
                                                )
15  This document relates to:                   )
                                                )
16  *Patricia Danylyshyn-Adams v. Johnson &*    )   **NOTICE OF COURT ORDER RE**
    *Johnson, et al.*, San Diego County Superior Court,  )   **COORDINATION OF ADD-ON CASES**
17  Case No. 37-2020-00000905;                  )
                                                )
18  *Devra Hutchinson, Individually, as Personal*  )
    *Representative of the Estate of Naomi Lydia and as*  )
19  *Successor in Interest of Naomi Lydia; Gary Lydia,*  )
    *Individually and as Successor in Interest of Naomi*  )
20  *Lydia v. Johnson & Johnson, et al.*, Alameda  )
    County Superior Court, Case No. RG20068771.  )
21                                              )
                                                )
22  _____        )

23

24          PLEASE TAKE NOTICE that on November 18, 2020, the Honorable Judge Daniel J. Buckley,

25  Coordination Trial Judge for *Johnson & Johnson Talcum Powder Cases*, Judicial Council Coordination

26  Proceeding No. 4872 ("JCCP 4872"), entered an Order re Coordination of Potential Add-On Cases, a copy

27  of which is attached hereto as Exhibit 1, that the following cases shall be deemed coordinated, solely for

28  pre-trial purposes, along with the actions that are already the subject of the coordinated JCCP 4872

                                                1
    _____
    NOTICE OF COURT ORDER RE COORDINATION OF POTENTIAL ADD-ON CASES

proceeding and ordering the cases transferred to Los Angeles County Superior Court.

1. *Patricia Danylyshyn-Adams v. Johnson & Johnson, et al.,* San Diego County Superior Court, Case No. 37-2020-00000905;

2. *Devra Hutchinson, et al. v. Johnson & Johnson, et al.,* Alameda County Superior Court Case No. RG20068771.

PLEASE TAKE FURTHER NOTICE that all hearings, deadlines and events in the Courts in which the actions were originally filed are thereby vacated and stayed until further order of the JCCP 4872 Court.

ROBINSON CALCAGNIE, INC.

Dated:  November 30, 2020          By: _____

Mark P. Robinson, Jr., Esq.
Karen L. Karavatos, Esq.

***Attorneys for JCCP Petitioners***

NOTICE OF COURT ORDER RE COORDINATION OF POTENTIAL ADD-ON CASES

EXHIBIT 1

ORIGINAL

1  Mark P. Robinson, Jr., Esq. Bar # 054426
2  Karen L. Karavatos, Esq., Bar # 131718
   Cynthia Garber, Esq., Bar # 208922
3  **ROBINSON CALCAGNIE, INC.**
   19 Corporate Plaza Drive
4  Newport Beach, CA 92660
   Tel: 949-720-1288
5  Fax: 949-720-1292
   mrobinson@robinsonfirm.com
6  kkaravatos@robinsonfirm.com
   cgarber@robinsonfirm.com
7
8  **Attorneys for JCCP Petitioners**

FILED
Superior Court of California
County of Los Angeles

NOV 03 2020

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Maisha Pryor

FILED
Superior Court of California
County of Los Angeles

NOV 18 2020

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Stephanie Chung

9
10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
11                    **FOR THE COUNTY OF LOS ANGELES**
12
13  COORDINATION PROCEEDING            )  **JCCP NO. 4872**
    SPECIAL TITLE (Rule 3.550)        )
14                                     )  [This document relates to Case Nos 37-2020-
    **JOHNSON & JOHNSON TALCUM POWDER**)  00000905; RG20068771]
15  **CASES**                          )
    _____   )
16                                     )
    This document relates to:          )
17                                     )
    *Patricia Danylyshyn-Adams v. Johnson &* )  Judge: Hon. Daniel J. Buckley
18  *Johnson, et al.*, San Diego County Superior Court, )  Dept. SS-1
    Case No. 37-2020-00000905;         )
19                                     )
    *Devra Hutchinson, Individually, as Personal* )  **[PROPOSED] ORDER RE**
20  *Representative of the Estate of Naomi Lydia and as* )  **COORDINATION OF ADD-ON CASES**
    *Successor in Interest of Naomi Lydia; Gary Lydia,* )
21  *Individually and as Successor in Interest of Naomi* )
    *Lydia v. Johnson & Johnson, et al.*, Alameda )
22  County Superior Court, Case No. RG20068771. )
                                       )
23                                     )
    _____   )
24
25
26         The Court, sitting as Coordination Trial Judge in JCCP 4872, *Johnson & Johnson Talcum*
27  *Powder Cases*, has considered the Petition and Notice of Potential Add-On Cases and Request for
28

1

1   Coordination filed by the Petitioners identifying the following cases as appropriate for coordination in

2   JCCP 4872 along with those cases that are already the subject of this coordinated proceeding:

3
        1.   *Patricia Danylyshyn-Adams v. Johnson & Johnson, et al.,* San Diego County Superior
4            Court, Case No. 37-2020-00000905;

5       2.   *Devra Hutchinson, et al. v. Johnson & Johnson, et al.,* Alameda County Superior Court
             Case No. RG20068771.
6

7           The ten-day period for objections having passed, and no objection having been filed, and GOOD

8   CAUSE APPEARING, and pursuant to the Court's Case Management Order No. 2 Re Add-On

9   Procedures, the coordination of the above actions is appropriate.

10          **IT IS HEREBY ORDERED** that each potential add-on case listed above shall be

11  deemed coordinated, solely for pre-trial purposes, along with the actions that are already the subject of

12  this coordinated proceeding, JCCP 4872, titled *Johnson & Johnson Talcum Powder Cases* and the listed

13  cases are ordered transferred to this Court.

14          All hearings, deadlines and events in the Courts in which such actions were originally filed are

15  hereby vacated and stayed until further order of this Court.

16
17  DATED: _*Nov 18, 2020*_

18                                          _____
                                            HONORABLE DANIEL J. BUCKLEY
19                                          JUDGE OF THE SUPERIOR COURT

20
21
22
23
24
25
26
27
28

[PROPOSED] ORDER RE COORDINATION OF ADD-ON CASES

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is:

ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

On November 30, 2020 I served the foregoing document described as:

**NOTICE OF COURT ORDER RE COORDINATION OF ADD-ON CASES**

on the parties in this action as follows:

___ (By Mail) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Newport Beach, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. SEE ATTACHED SERVICE LIST

_X_ (By Electronic Service) I served each document via electronic transfer of the document file to Case Anywhere for service on all registered case users.   Each document electronically served pursuant to the Order authorizing Electronic Service shall be deemed to have been served under the California Rules of Civil Procedure.  Electronic service shall be complete at the time of transmission.

_X_ (By Electronic Service) I caused each document to be sent by electronic service by transmitting a true and correct copy as indicated on the attached service list via each individual's email.

___ (By Personal Service)  I caused each document to be delivered by hand by First Legal to the business address of the addressee.

_X_ STATE:  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

___ FEDERAL: I declare that I am employed in the office of a member of a Bar of this Court at whose direction the service was made.

Executed on November 30, 2020, at Yorba Linda, California.

Conda Takanabe

NOTICE OF COURT ORDER RE COORDINATION OF POTENTIAL ADD-ON CASES

1

## SERVICE LIST

2

**BY MAIL**

3

| | |
|---|---|
| Chair, Judicial Council of California<br>Administrative Office of the Courts<br>Attn: Court Programs and Services Division<br>(Civil Case Coordination)<br>455 Golden Gate Avenue<br>San Francisco, CA 94102-3688<br>coordination@jud.ca.gov | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF COURT ORDER RE COORDINATION OF POTENTIAL ADD-ON CASES